IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 5, 2018

**STATE OF TENNESSEE v. CHRISTOPHER TALLEY**

**Appeal from the Criminal Court for Shelby County**
**No. 14-05964       Glenn I. Wright, Judge**

**No. W2017-01752-CCA-R3-CD**

A Shelby County jury convicted the Defendant, Christopher Talley, of attempted second-degree murder, aggravated assault, and theft of property valued under $500. The trial court sentenced him to an effective sentence of twenty-four years of incarceration. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) the prosecutor committed prosecutorial misconduct; and (3) the trial court erred when it applied certain enhancement factors at sentencing. After review, we affirm the trial court's judgments.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. THOMAS T. WOODALL, J., filed a concurring opinion.

Claiborne H. Ferguson and John Patrick McNeil (at trial), Gregory D. Allen (on appeal), Memphis, Tennessee, for the appellant, Christopher Talley.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; Gavin Smith, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the strangulation of a T.J. Maxx store security guard. The Shelby County grand jury indicted the Defendant and a female co-defendant with

attempted first-degree murder, aggravated assault by strangulation, and theft of property valued under $500. At the Defendant's trial on these charges, the parties presented the following evidence: Eldridge Davis testified that he was forty-nine years old at the time of trial and had two teenage children. Mr. Davis served as a lieutenant on the Memphis Fire Department and had also worked in loss prevention for T.J. Maxx for almost seventeen years. Mr. Davis said that, on August 10, 2014, he was working at T.J. Maxx. He recalled that he was in his office conducting paperwork while looking at the cameras when he saw a man come into the store who looked familiar to him. He later identified the man as the Defendant. The Defendant immediately started picking up several purses and not looking at the prices, which signaled Mr. Davis to investigate further. Mr. Davis explained that the store had recently had several "grab and runs." This was a term used for the situation when a customer came into the store, grabbed merchandise, and then ran out the door to a vehicle with a driver awaiting them to leave.

To investigate, Mr. Davis said that he went to the front of the store to see the Defendant more clearly. He watched as the man came out of the purse department, looked around, and immediately exited the store. Mr. Davis followed the Defendant out of the exit, identified himself as a security officer, and told the Defendant to return to the store. At the time, Mr. Davis noted that there was a tan-colored SUV sitting outside T.J. Maxx. Although the windows were tinted, Mr. Davis saw that there was a female in the driver's seat. The Defendant did not initially comply with Mr. Davis's request to return to the store, but Mr. Davis then assisted him back into the store. As the two were headed toward Mr. Davis's office, the Defendant said, "N-word, 'I'll kill you.'" The Defendant then dropped the purses to the floor and reached toward his own waistband, so Mr. Davis put his arms up and restrained him.

Mr. Davis said that he continued to walk the Defendant back to his office, during which time the Defendant was cursing and using profanity. The Defendant tried to kick racks over and was scaring the customers. When the two men arrived at Mr. Davis's office, Mr. Davis sat the man in a chair, which was not his usual routine. He explained that he did not trust the Defendant based on his behavior, so he "cuffed" him. Mr. Davis said that the Defendant was "fidgeting," and Mr. Davis told him to "be cool" and to "keep his hands where [Mr. Davis] could see them."

Mr. Davis said that he backed away from the Defendant, who jumped up and went away from the office door. Mr. Davis noted that in his office were security ink tags with cords and ten-pound metal "detachers." The Defendant went toward the detachers, and Mr. Davis got his hands on one to prevent the Defendant from picking it up. The Defendant then grabbed the phone cord and wrapped it around Mr. Davis's neck. Mr. Davis said that the two men were "tussling," and Mr. Davis tried to push the Defendant away from the counter where there were several detachers. Mr. Davis said that, at some

point, he lost his balance. When he pulled away from the Defendant, the Defendant tightened the cord around his neck. Mr. Davis saw the Defendant's hands pulling the cord around his neck.

Mr. Davis said that he could not speak because of the cord around his neck. Mr. Davis said the he felt himself get light-headed and knew that the situation "was getting serious." Mr. Davis pulled a hammer from his desk drawer and tried to hit the Defendant with it. He was, however, so weak that he was unable to swing the hammer and it fell onto the floor. One of the legs on the desk broke, causing the men to fall.

Mr. Davis said that he fell on top of the Defendant and that the Defendant continued tightening the cord around Mr. Davis's neck. Out of his peripheral vision, Mr. Davis saw a woman, later identified as his co-defendant, holding a child, open the door of his office. The woman said something, but Mr. Davis could not make out what she was saying because of the ringing in his ears due to the ligature around his neck. Mr. Davis said that he reached for the Defendant's throat, and the woman grabbed his hands and held them back while the Defendant continued to choke him. Mr. Davis said that he thought he was going to die, and he wondered what his wife would tell his children after his death.

Mr. Davis said that he must have lost consciousness because, when he regained consciousness, a female customer was standing over him asking if he was all right. She told him that she was a nurse. Mr. Davis said that he went to the hospital where he stayed for that day. He had to return to the hospital later for surgery because he tore "some things" in his legs. Mr. Davis said that he suffered scratches, bruises, and bloodshot eyes.

Mr. Davis said that he gave his statement to police and that he identified the Defendant from a photographic lineup. Mr. Davis said that all of these events were captured in a video taken from his office that day. While watching the video with the jury, Mr. Davis clarified that he was "going" to cuff the Defendant but that the Defendant attacked him before he could do so. The video comported with Mr. Davis's testimony.

During cross-examination, Mr. Davis said he did not recall previously detaining the Defendant and that he was unsure why his face looked familiar. Mr. Davis said that when he first approached the Defendant after the Defendant left the store with the purses, the Defendant "bump[ed]" into him, and Mr. Davis "sp[u]n him around." He agreed that the Defendant did not hit or punch him at this time. Mr. Davis agreed that he outsized the Defendant. Mr. Davis said that, since the Defendant dropped the merchandise as they were walking to his office, he needed to call someone to retrieve the merchandise. Based upon the Defendant's behavior, however, he wanted to handcuff the Defendant first.

3

When the Defendant saw Mr. Davis go for the handcuffs, the Defendant "reacted."

Mr. Davis said that he did not recall stabbing the Defendant with scissors. Mr. Davis said that he did not bleed as a result of this incident, so any blood on the floor of his office did not belong to Mr. Davis. He agreed that he was told that the scissors had blood on them and that the contents of his drawer had to be discarded because they were contaminated with blood. Mr. Davis said that the Defendant repeatedly told him "I have AIDS." The Defendant made this statement while Mr. Davis was being strangled, so he said he was unsure what the Defendant meant by it. Mr. Davis said that, on the video, the Defendant is seen still holding his hands around Mr. Davis's neck after Mr. Davis loses consciousness.

During redirect-examination, Mr. Davis said that the Defendant could have hit his head when the two fell onto the floor, causing him to bleed. Mr. Davis said that the two hit the floor "pretty hard," which caused Mr. Davis to tear his ACL and his meniscus and also to fracture his tibia.

Aubrey Anthony, who was shopping at T.J. Maxx on the day of these events, testified that she saw Mr. Davis walking the Defendant toward the back of the store. She said that Mr. Davis was holding the Defendant "behind his neck," and the Defendant was hollering, screaming, and cursing. Ms. Anthony saw the two men go into the security office. She then heard a ruckus like fighting, so she called 911. She then ran to the front of the store looking for a manager. Ms. Anthony ran toward the back of the store, and she heard the Defendant say "I'm going to kill you," and "I'm going to give you AIDS." She then heard a lady screaming, "Stop stabbing him, stop stabbing him." Ms. Anthony said a lady and a little girl then ran out of the security office and, soon thereafter, the Defendant ran from the office, and he was bleeding all over.

Ms. Anthony said that, although she was shopping at T.J. Maxx that day, she also worked there part time. She knew Mr. Davis from her employment with him. She was certain that it was not Mr. Davis's voice saying "I'm going to kill you. I have AIDS."

Denise Shelton testified that she was the Assistant Manager at T.J. Maxx on the day of this incident. She said that, as she was arriving, she saw someone leaving the store with purses. She then went into the store, heard someone say that Mr. Davis was hurt, and went to Mr. Davis's office. She found Mr. Davis lying on the floor with a cord wrapped around his neck. Another woman present, who said she was a nurse, assisted her in removing the cord from around his neck.

Jackeline Harris, another T.J. Maxx employee, testified that she was working in the jewelry department when Mr. Davis took the Defendant to the back of the store. She

4

described the Defendant as "wrestling" with Mr. Davis. The Defendant asked Mr. Davis why he was taking him to the back of the store, and Mr. Davis responded that the Defendant had been stealing. The Defendant then said that he had to go to the bathroom, and Mr. Davis told him that he should have thought of that before taking merchandise. Ms. Harris said that, a short time later, she saw the Defendant run back by the jewelry counter, grab "a whole lot of purses" and run out the door without paying for them.

Joshua Stanley, an officer with the Memphis Police Department, testified that he was assigned to investigate this case on August 11, 2014. He obtained the surveillance video of the incident, which he reviewed and from which he created still images of the suspects. He released those images to media outlets, and he received a tip on August 13, 2014. This tip included the Defendant's last name, which Officer Stanley put into a database, and he obtained the Defendant's address. He then called the phone number associated with that address, and the Defendant's mother answered. He spoke with her, and then he used the Defendant's picture to create the photographic lineup that he presented to Mr. Davis on August 14, 2014, and from which Mr. Davis identified the Defendant as his assailant. At that same meeting, Mr. Davis provided him a statement. Officer Stanley issued a warrant for the Defendant's arrest.

Based upon this evidence, the jury convicted the Defendant of the lesser-included offense of attempted second-degree murder and the charged offenses of aggravated assault and theft of property valued under $500.

## B. Sentencing

Before sentencing, the Defendant filed a motion to relieve counsel, which the trial court granted and appointed new counsel. Also before sentencing, the State filed a notice of enhancement factors, including that the Defendant had a previous history of criminal convictions or behavior, that he was the leader in the commission of an offense involving two or more actors, and that he had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114 (1), (2), and (10) (2014). During the hearing, the Defendant's attorney approached the bench and asked that the trial court consider in mitigation that the Defendant was HIV positive.

The trial court reviewed and admitted the presentence report. The Defendant's attorney informed the trial court that the Defendant had some high school education and also attended several community colleges, with a focus on cosmetology. The Defendant's attorney acknowledged that the Defendant had some previous criminal history, including two B felonies and three C felonies, making him a Range III offender.

The Defendant's attorney noted that some mitigating factors applied, including

5

that the Defendant acted under strong provocation and in self-defense without a cooling down period. The Defendant also asserted that he was hit by the security guard first. The Defendant's attorney noted that the Defendant had a history of mental illness, including anxiety and depression. Finally, the Defendant's attorney noted that the co-defendant in this case had received only a two-year sentence. The State argued in favor of the enhancement factors it had requested.

Carolyn Tunstall testified that the Defendant was one of her younger brothers, estimating that he was twelve or thirteen years her junior. She said that he came from a large family and that he had always been a "troubled" child. Ms. Tunstall said that she moved away when the Defendant was still young, so she did not recall how his mental illness had been addressed. Ms. Tunstall said that the Defendant had been "bounced around from . . . juvenile facilities to some other facilities." She said that the Defendant had been affected by things that had happened in those facilities.

The Defendant spoke to the court, saying that he should not have committed these crimes but that he never intended or tried to kill anyone. He said that he was overcharged and instead acted in self-defense. He said he never would have reacted the way he did had the security guard not hit him. He would have waited for the police to come and charge him with the theft. The Defendant further posited that he was not a career offender. The Defendant said that he was not a monster and that he needed help.

The State argued that the enhancement factors applied and that the jury had been instructed on self-defense and that it had rejected that argument. The State asked that the Defendant be sentenced at the top of the range for a Range III offender. It asserted that the Defendant had sixteen prior felony convictions dating back to 1987.

The trial court made the following findings:

I've considered the evidence at trial and at this sentencing hearing, which was: [the Defendant's] sister. The presentence report, Exhibit[] 1. And the other exhibits, Exhibit 1A, Exhibit[] 2. The principal[s] of sentencing and arguments as to sentencing alternatives. The nature of the criminal conduct involved in this case.

[The Defendant] essentially was shoplifting when he was confronted by the security guard who took him back to the security office and at some point there was a scuffle and [the Defendant] used some items to choke the security guard with and choke him until he was unconscious. And then he left him there on the floor and as he was leaving the store he managed to pick up an item and to shoplift on the way out the door.

6

And I mention that because it's some callousness involved there. Not know[ing] what he had done to the security guard he still shoplifted.

I have considered the evidence in both as to enhancement and mitigation. I do think he was the leader in the commission involving two or more criminal actors. I do think he has a previous history of criminal convictions or criminal behavior. He had no hesitation about committing a crime when the risk [to] human life was high.

The trial court found that no mitigating factors applied. It did, however, consider that there was some history of the Defendant suffering from anxiety and or depression. The trial court also considered that the Defendant had participated in classes while in jail, including an alcohol and drug rehabilitation class, an anger management course, and a life skills class. The trial court found, however, that this only showed some slight potential for rehabilitation.

The trial court found that the Defendant was a Career Offender for the aggravated assault conviction, a Class C felony, making the applicable sentence fifteen years. The trial court sentenced him to fifteen years as a Career Offender on this offense. For the attempted second degree murder conviction, a Class B felony, the trial court found that the Defendant was a Range III, Persistent Offender. The trial court found the Defendant's applicable range was twenty to thirty years, and he sentenced the Defendant to twenty-four years. For the final conviction, theft of property, a misdemeanor, the trial court sentenced the Defendant to eleven months and twenty-nine days. The trial court ordered that all the sentences run concurrently for a total effective sentence of twenty-four years in the Department of Correction.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) the prosecutor committed prosecutorial misconduct; and (3) the trial court erred when it applied enhancement factors.

### A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain each of his convictions, and we will articulate his specific arguments below. When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of

8

guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. Attempted Second Degree Murder

The Defendant contends that the evidence was insufficient to sustain his conviction for attempted second degree murder because the evidence showed that he reacted to Mr. Davis grabbing him. He notes that a witness said that Mr. Davis held the Defendant by the neck as he walked him through the store back to the office. The Defendant further notes that he did not use a weapon, such as the scissors or the hammer, to strike Mr. Davis while he was on the ground. The State contends that the evidence is more than sufficient to sustain the conviction. We agree with the State.

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (2014). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2016). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2) (2016). Attempted second degree murder, therefore, requires the State to prove that a defendant acted with the intent to knowingly kill another and believed that his conduct would cause the killing without further conduct on the defendant's part.

In the case under submission, the Defendant entered the T.J. Maxx store and grabbed some merchandise, leaving without paying for it. Mr. Davis approached him, and the Defendant returned with Mr. Davis back into the store, knocking over tables and yelling profanity and threatening to kill Mr. Davis while going through the store. The Defendant dropped the merchandise while on the way to the office. When in Mr. Davis's office, Mr. Davis placed the Defendant in a seat and began to make a call to get someone to bring him the merchandise so he could fill out the necessary paperwork. Simultaneously, Mr. Davis reached into his pocket for his handcuffs. Upon seeing Mr. Davis reach for the handcuffs, the Defendant stood and went toward some large heavy objects. Mr. Davis, fearing that he would be attacked with the objects, stopped the Defendant from gaining possession of them. The Defendant then grabbed a telephone cord and placed it around Mr. Davis's neck. The two men scuffled, as can be seen in the video, and Mr. Davis began to lose strength. He opened his desk drawer and attempted to get a hammer, but, losing strength from the ligature, could not swing the hammer. The Defendant maintained and tightened pressure on the cord wrapped around Mr. Davis's

9

neck. His co-defendant entered the office, and she held Mr. Davis's hands back while the Defendant continued applying pressure on the cord around Mr. Davis's neck. Eventually, Mr. Davis lost consciousness. The Defendant maintained pressure on the cord for a short period of time after Mr. Davis lost consciousness, and then he left the office. This evidence supports the jury's conclusion that the Defendant's actions met the necessary elements of attempted second degree murder.

As to the Defendant's contentions that his actions were in response to Mr. Davis's treatment of him, this is a jury question. The jury was instructed on self-defense, and they rejected that defense. "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief on this issue.

## 2. Aggravated Assault

The Defendant next contends that the evidence is insufficient to sustain his conviction for aggravated assault because, when the witness found Mr. Davis after the incident, the cord was only "semi-tight" around Mr. Davis's neck. This, the Defendant posits, proves that the Defendant was not trying to strangle Mr. Davis but rather only protecting himself. The State counters that the proof at trial supporting this conviction was overwhelming. We agree with the State.

Aggravated assault occurs when a defendant intentionally, knowingly, or recklessly causes bodily injury to another. T.C.A. § 39-13-101(a)(1) (2016). A person commits aggravated assault who: "(A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . Involved strangulation or attempted strangulation . . . ." T.C.A. § 39-13-102(a)(1)(A)(iv).

> For purposes of subdivision (a)(1)(A)(iv), "strangulation" means intentionally or knowingly impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim.

T.C.A. § 39-13-102(a)(2).

The evidence in this case, viewed in the light most favorable to the State, shows that during a struggle with Mr. Davis the Defendant reached for the phone cord. He wrapped the cord around Mr. Davis's neck and applied pressure. The Defendant

10

continued to apply pressure until Mr. Davis lost consciousness and for some period of time after Mr. Davis lost consciousness. The entire incident was recorded on surveillance footage from Mr. Davis's office, and the video comports with the witnesses' testimony about the assault. The evidence supports the Defendant's conviction, and he is not entitled to relief on this issue.

### 3. Theft

The Defendant contends that the evidence is insufficient to sustain his conviction for theft of property valued at less than $500 because the State did not prove his identity or the value of the items taken. The State counters that it proved the requisite elements of theft. We agree.

A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103(a) (2016). "Theft of property or services is: (1) A Class A misdemeanor if the value of the property or services obtained is five hundred dollars $500 or less. T. C.A. § 39-14-105(a).[1] When the State does not present evidence regarding the actual value of the items stolen, the jury is free to infer that the items had some value, which is sufficient to support a conviction for misdemeanor theft. *See State v. Charles Cox*, W2010-00129-CCA-R3-CD, 2010 WL 5270622, at *3 (Tenn. Crim. App., at Jackson, Dec. 13, 2010), *no Tenn. R. App. P. 11 application filed* (citing *See State v. Hill*, 856 S.W.2d 155, 156 (Tenn. Crim. App. 1993)).

In this case, the evidence viewed in the light most favorable to the State, showed that the Defendant entered the T.J. Maxx store and began grabbing purses without looking at the prices listed on the purses, which Mr. Davis said were a "higher ticket" item. Mr. Davis saw the Defendant's behavior and noted that it seemed suspicious, so he went to the front of the store to watch the Defendant. The Defendant left the store with the purses and went toward a car being driven by his co-defendant. Mr. Davis apprehended the Defendant and brought him back into the store. Mr. Davis identified the Defendant in court and said that the Defendant left the store with the purses before Mr. Davis apprehended him. The Defendant's actions constitute theft. Additionally, another witness testified that, as the Defendant was later leaving the store, he again grabbed purses before he left, taking them out the door with him. We conclude that the State proved that the Defendant exercised control over the purses with the intent to deprive T.J. Maxx of the property without its consent. We further conclude that the State provided enough evidence upon which the jury could conclude that the purses had "some value." The Defendant is not entitled to relief on this issue.

---

1 T.C.A. § 39-14-105(a) was changed in 2016 to increase the value of theft of property qualifying as a Class A misdemeanor from $500 to $1,000.

## B. Prosecutorial Misconduct

The Defendant next contends that the prosecutor committed reversible misconduct when, during closing arguments, he quoted Mark Twain, saying "if you can't convince them, confuse them," and then directing the jury's attention to defense counsel's questions during cross-examination of witnesses. The Defendant notes that the quote was misattributed to Mark Twain. He also acknowledges that he did not lodge a contemporaneous objection but asks this court to review the issue for plain error. The State counters that plain error review is not warranted because no clear and unequivocal rule of law was breached and because the Defendant did not prove that the waiver was not for tactical reasons. We agree with the State.

The Defendant's failure to object to the State's argument at trial precludes our review of this issue, subject to our noticing "plain error." *See* Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in the motion for new trial . . . ."); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives any later complaint).

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. *See, e.g., State v. Marshall*, 870 S.W.2d 532 (Tenn. Crim. App. 1993), overruled on other grounds by *State v. Carter*, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); *State v. Butler*, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); *Anglin v. State*, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "when 'necessary to do substantial justice,' this Court has the authority to 'consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" *State v. Hatcher*,

12

310 S.W.3d 788, 808 (Tenn. 2010). We refer to this discretionary consideration of waived issues as "plain error" review. *Id.* (citing *Grindstaff v. State*, 297 S.W.3d 208, 219 n.12 (Tenn. 2009)).

When considering whether "plain error" exists we consider the following factors: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test articulated by the Court of Criminal Appeals in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before an appellate court will recognize the existence of "plain error," and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id.* In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642.

"Courts have recognized that closing argument is a valuable privilege afforded to the State and the defense and have afforded wide latitude to counsel in arguing their cases to the jury." *State v. Cleveland*, 959 S.W.2d 548, 551 (Tenn.1997) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). We have recognized five general areas of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Having reviewed the closing argument in its entirety, we conclude that plain error review is not warranted. The comment does not constitute a breach of the wide latitude afforded during closing arguments. The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant contends that the trial court erred when it sentenced him, contending that the trial court misapplied enhancement factors (2) that he was a leader in the commission of an offense involving two more criminal actors and (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. *See §* T.C.A. 40-35-114 (2), (10) (2014). The State contends that the sentence was within range, that there is at least one applicable enhancement factor, and that the sentence therefore is proper. We agree.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707. The defendant bears "[t]he burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made on the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Bise*, at 708. A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id*. at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

We conclude that the trial court properly sentenced the Defendant. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. The evidence presented at trial and during the sentencing hearing supports the trial court's application of enhancement factor (1), that the Defendant had a previous history of criminal convictions or behavior. We agree that the evidence does not support

the application of enhancement factor 10, that the defendant had no hesitation about committing a crime when the risk to human life was high, because that enhancement factor is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim. See *State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017). The record in this case contains no proof that any person other than the victim was put at risk by the Defendant's offense. Accordingly the trial court erred in this regard. While the trial court erred in the misapplication of a single enhancement factor, the misapplication does not void the Defendant's sentence. *See Bise* at 708. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE